## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, and [UNDER SEAL], <br><br> Plaintiffs, <br><br> v. <br><br> [UNDER SEAL] <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> )   **No.** <br> ) <br> )   **FILED IN CAMERA AND** <br> )   **UNDER SEAL** <br> )   **JURY TRIAL DEMAND** <br> ) |

## PLAINTIFF/RELATOR MOTION TO FILE UNDER SEAL

Gaylon C. Hayes, Lead Counsel
OBA # 14492, Tx Bar24071384
Harry "Skeeter" Jordan
OBA # 32437
6805 South Western Ave. Suite 500
Oklahoma City, OK 73139
Telephone: 405-616-5045
Facsimile: 405-616-5062
gaylon@hhhlawfirm.com
whitney@hhhlawfirm.com
skeeter@blsmithlaw.com

*Attorneys For Plaintiffs*

# UNDER SEAL

## PLAINTIFF/RELATOR'S MOTION TO FILE UNDER SEAL

**COME NOW,** Lola Normand and Stacy Garrett **("Relators")**, and

respectfully moves this Court to file Relator's Complaint under seal

pursuant to the procedural requirements of 31 U.S.C. § 3729 *et seq.* and

applicable local Court Rules.


Respectfully Submitted,


Gaylon C. Hayes
OBA # 14492, Tx Bar24071384
6805 South Western Ave. Suite 500
Oklahoma City, OK 73139
Telephone: 405-616-5045
Facsimile: 405-616-5062
gaylon@hhhlawfirm.com
whitney@hhhlawfirm.com
skeeter@blsmithlaw.com
*Attorney for Relator*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

| | |
|---|---|
| THE UNITED STATES OF AMERICA, and [UNDER SEAL],<br><br>    Plaintiffs,<br><br>v.<br><br>[UNDER SEAL]<br><br>    Defendants. | )<br>)<br>)<br>) No.<br>)<br>) FILED IN CAMERA AND<br>) UNDER SEAL<br>) JURY TRIAL DEMAND |

## COMPLAINT

Gaylon C. Hayes, Lead Counsel
OBA # 14492, Tx Bar24071384
Harry "Skeeter" Jordan
OBA # 32437
6805 South Western Ave. Suite 500
Oklahoma City, OK 73139
Telephone: 405-616-5045
Facsimile: 405-616-5062
gaylon@hhhlawfirm.com
whitney@hhhlawfirm.com
skeeter@blsmithlaw.com

*Attorneys For Plaintiffs*

# UNDER SEAL

**Table of Contents**

I.INTRODUCTION................................................................................1

II. JURISDICTION AND VENUE .......................................................3

III.PARTIES.......................................................................................4

    A.   Defendants.............................................................................4

    B.   Relators ................................................................................4

IV. LEGAL FRAMEWORK...................................................................5

V. FACTUAL ALLEGATIONS...............................................................6

VI. LEGAL AUTHORITIES................................................................13

    LIABILITY ATTACHES FROM SEEKING FUNDS THAT PROVIDER IS
STATUTORILY PROHIBITED FROM RECEIVING...................................18

    CIVIL PENALTIES......................................................................25

    DAMAGE CALCULATION............................................................37

    NATURE AND EXTENT OF THE DEFENDANTS' WRONGFUL
CONDUCT........................................................................................38

VII. CLAIMS....................................................................................38

    COUNT 1: False Claims Submitted Under 31 U.S.C. § 3729(a)(l)(A) .............38

    COUNT 2: Use of False Records Under 31 U.S.C. § 3729(a)(l)(B)..................41

    COUNT 3: Conspiracy Under 31 U.S.C. § 3729(a)(l)(C) ...............................41

    COUNT 4: Retention Of Overpayments Under 31 U.S.C. § 3729(a)(l)(G) .....42

    COUNT 5: Retaliation Under 31 U.S.C. § 3730(h)...................................43

VII.REQUEST FOR TRIAL BY JURY..................................................44

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS,
HOUSTON DIVISION

| | |
|---|---|
| 1) THE UNITED STATES OF AMERICA<br>   and<br>2) LOLA NORMAND,      and<br>3) STACY GARRETT,<br><br>Plaintiffs,<br><br>v.<br><br>1) UNITED SEATING AND MOBILITY, LLC,<br>doing business as NUMOTION,<br>and<br>2) WHEELERS MEDICAL SUPPLY LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)  No.<br>)  FILED IN CAMERA AND<br>)      UNDER SEAL<br>)<br>)<br>)<br>)<br>)<br>)<br>)  JURY TRIAL DEMANDED |

## COMPLAINT

COME NOW, Lola Normand and Stacy Garrett ("Relators"), and files this Complaint on behalf of the United States of America ("USA") against Numotion, United Seating and Mobility, LLC, doing business as Numotion ("Numotion") and Wheelers Medical Supply LLC ("Wheelers") (collectively, "Defendants"), and alleges the following:

## I.    INTRODUCTION

1.    This action and Relators' claims arise pursuant to the Federal False Claims Act ("FCA"), 31 USC § 3729 *et seq.,* and state statutes, rules, and regulations. The FCA and each of the FCA prohibited Acts authorize private persons to bring a civil action

Page | 1

for the person and the applicable governmental entity against a person who commits one or more acts in violation of the particular false claims statute. Remedies include the recovery of a civil penalty for each false claim violation and a multiple of damages based on a single damages' multiplier (e.g., treble damages and civil penalties under the FCA). As an award, the Relator is entitled to receive a percentage of the proceeds of the action or settlement of the claim(s) and an award against the Defendant(s) for reasonable expenses, plus attorney fees and costs.

2.     Defendants' unlawful acts in violation of the FCA and the FCA Acts concern Defendants' submission of false claims to Federal health care programs, related to Defendants' schemes employed for the ordering and providing medical supplies and equipment furnished to program beneficiaries, and Defendants' use of materially false records and statements in support of those false claims.

3.     That said Defendants, and each of them, worked together to apply for federal funds, which they were not eligible to receive due to failure to comply with the rules and regulations of the federal government, CMS, state laws and statutes, state Medicaid regulations, and breach of the conditions and certifications precedent to being eligible to apply for or receive funds.

4.     Relators' claims include damages concerning FCA violations relating to Medicare and Medicaid programs in each state where Defendants operate.

5.     Relators, employees, warned the Defendants of the wrongful conduct and the fact

that the waiver of co-payment was a violation of their agreement with the government. The Defendants began a retaliatory campaign of harassment and counseling, which also included threats to Relators employment for which the Relators are entitled to recover damages for harm caused to them by this retaliation.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3730(b). This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a). This Court also has supplemental jurisdiction over the state law regarding the waiver of co-payments due under Medicare and/or Medicaid, in each separate state.

7. Venue in this Judicial District is appropriate under 31 U.S.C. § 3732(a) because one or more of the Defendants transact or have transacted business in this Judicial District.

8. Relators believe there has been no public disclosure of the allegations and transactions on which this action is based; but should the question arise, and should the Court determine otherwise, the Relators are an original source of the information on which the allegations in this complaint are based, as defined in FCA §3730(e)(4)(B). As members of the profession and Numotion staffers, Relators have knowledge and information which is not publicly available.

### III. PARTIES

#### A. Defendants

9.    Numotion is a limited liability company formed under the laws of the State of Missouri, and has a principal place of business in Connecticut. Numotion's website, however, states that there are more than 150 Numotion locations nationwide.

10.    Wheelers is a limited liability company formed under the laws of the State of Florida, and has a principal place of business in Florida.

#### B. Relators

11.    This action is brought by two Relators.

12.    Relator Lola Normand is a citizen of the United States and a resident of Baker, Louisiana. Relator holds a B.S. Degree. Relator started with Numotion in December of 2016 as a customer care coordinator. Ms. Normand changed positions with Numotion in January of 2018 when she became a sales representative. She previously worked as a medical assistant and EMT, and still currently works for Defendant Numotion. Ms. Norman is also a Licensed Practical Nurse.

13.    Relator Stacy Garrett is a citizen of the United States and a resident of Friendswood, Texas. She began working for the Defendants on or about December 29, 2014, and her last day of employment with the Defendants was in April of 2022. She was involved as a sales representative and claims service specialist. She functioned in leadership positions as a project team leader. She was discharged for no stated reason after completing a leadership

assignment and complained about the Defendants' noncompliance with Medicare and Medicaid rules and regulations.

## IV. LEGAL FRAMEWORK

14.    The Defendants, as they currently exist, are the result of several mergers and acquisitions of several legal entities.

15.    The thing that guarantees profitability of the resulting Defendants are the uniform policies of not requiring beneficiaries to pay statutory co-pays, paying a kickback to the beneficiaries by guaranteeing the healthcare beneficiary will never have to pay their co-pay.

16.    By creating the business model prior to submitting claims to the government, all claims were paid under a kick-back scheme, therefore they are federal false claims under the Federal False Claims Act (FCA).

17.    The new business model implemented by Numotion included elements relevant to this claim as follows:

   a.  A policy of remitting to every federal healthcare program beneficiary their copay, in most cases 20% of the total cost of the product or service paid by the healthcare program. In other words, it was well established that the employees of Numotion were to tell prospective customers that if they purchased Numotion products, they would not have to pay their insurance deductible. Thereby providing an economic "renumeration": to the prospective customers

and beneficiaries of federal healthcare programs. This conduct renders Defendants ineligible to submit claims under the respective programs per their violations of Anti-Kickback Statutes.

b. Requiring employees to instruct other employees on the scheme to insure a 30% profit margin on everything sold. As an example: Employees were instructed to either change the item prescribed to a higher cost item or to tell the customer that they had to add something extra and more expensive, such as a catheter application kit to ensure that the total sale would be sufficient to have Numotion retain a 30% profit on the sale. This resulted in the submission of False Claims as the applicator or other products were not medically necessary, as well as false records and documents were used.

c. Splitting orders and shipping medically unnecessary refills to other states, all contrary to Federal law, along with Medicare and Medicaid rules and regulations, as well as OIG operations.

## V.     FACTUAL ALLEGATIONS

18. When equipment needs service, Defendants either send service technicians to the customers (e.g., their homes, apartments, work places, etc.) or customers bring their equipment to one of Defendants' numerous service locations throughout the United States.

19. Technicians are generally certified through DMERT, a non-profit organization that sets the benchmark for durable medical equipment ("DME") training standards.

20. Defendants represent to customers that the majority – if not all – of the technicians are certified technicians.

21. However, in actuality, the majority – if not all – of the technicians are not certified, and the technicians have little to no formal training.

22. Moreover, Defendants are billing Medicare and Medicaid for certified technicians, knowing that such technicians are not certified.

23. On information and belief, Defendants employ hundreds of technicians who are not certified.

24. On information and belief, the technicians have 20-30 appointments per day to work on customers' equipment.

25. Often times, the technicians do not properly fix the equipment, leading to subsequent failures and customers being without their custom equipment for significant periods of time.

26. Also, customers often wait significant amounts of time for technicians to service and/or repair their equipment.

27. Moreover, new custom equipment often has issues from the beginning.

28. On information and belief, Defendants use improper sales methods and misrepresentations to keep profit margins at or above 30%.

29. Defendants charge cash customers a different price than they charge Medicare and Medicaid.

30. For example, certain cash customers are charged at 1.6 times the retail cost of an item.

31. Further, in certain scenarios, Defendants tell customers that insurance will not cover certain supplies and/or equipment.

32. This practice generally occurs when certain insurance providers that have a low payment when such supplies and/or equipment are involved.

33. In these instances, Defendants tell the customer that he/she can instead pay cash for such supplies and/or equipment.

34. This practice allows Defendants to maintain their desired profit margin.

35. Alternatively, Defendants often times tell the customer that the supplies and/or equipment they are trying to order should be paired with another product and/or a kit, even when the prescription from the customer's doctor is for the originally ordered supplies only.

36. This practice is also used to keep the profit margin up, even when it means selling additional supplies, equipment, and/or kits for the originally ordered supplies that are not desired or necessary for customers.

37. The inclusion of other supplies and/or a kit to keep margins up usually requires letters of medical necessity for the additional supplies and/or kits being ordered.

38. Defendants have prepared templates for their customer care coordinators to choose from when preparing letters of medical necessity for the additional supplies and/or kits

being ordered.

39.     Defendants' customer care coordinators use the prepared templates to create letters of medical necessity for the additional supplies and/or kits, and then send the completed letters of medical necessity to each customer's doctor for approval.

40.     These greedy tactics result in Medicare and Medicaid being billed for supplies and/or kits that are not, in actuality, medically necessary for Medicare and/or Medicaid recipients, but are instead necessary for Defendants' higher profit margins.

41.     Another tactic Defendants use to gain higher profits from all customers, including Medicare and Medicaid recipients, is by billing supplies as shipped to a higher payment state when, in actuality, supplies and/or equipment was shipped to several states and should have been billed for payment to the state in which the customer resides in.

42.     On information and belief, Defendants are manually adjusting these claims in their system to indicate that all supplies were shipped to the higher payment state.

43.     For example, if a customer needs certain supplies while at a hospital or care facility in one state, but is about to leave the hospital or facility and will be going to another state, Defendants will send supplies and/or equipment to both states. Defendant, however, bills Medicare and/or Medicaid for all of the supplies as if they were only shipped to the state with the highest payment.

44.     On information and belief, Defendants did not and do not have proper licenses to operate in Maine or Montana.

45.    To circumvent the rules of those states, Defendants mail supplies and/or equipment to one of Defendants' locations near Maine or Montana, depending on the final destination of the supplies and/or equipment, and then uses a carrier service to deliver supplies and/or equipment into Maine and Montana.

46.    When this occurs, insurance payment, including payment from Medicare and Medicaid, is calculated based on the payment for the state where Defendants first sent the product and/or equipment, and not the state where the Medicare or Medicaid recipient resides.

47.    Defendants also employ improper tactics to meet their annual sales quotas.

48.    For example, on years when Defendants are short of their annual sales quotas, they will send supplies and/or equipment to customers, even when the customer did not need or want such equipment and/or such supplies.

49.    Defendants also employ improper methods to induce customers to choose their supplies by giving the customers certain supplies and/or equipment at no charge.

50.    For example, as a standard operating procedure, Defendants told and tell potential customers they will provide those customers and they have provided customers with free smart devices and/or seat elevators to induce customers to choose Defendant's wheelchairs.

51.    The customers who are told they would receive and who have received free supplies and/or equipment include Medicare and Medicaid recipients.

52.    Another method that Defendants use to entice customers to buy their supplies and/or or equipment is by telling the customer that Defendants will write off his/her co-pay prior to the purchase of the product and/or equipment.

53.    This method is used when dealing with Medicare and Medicaid recipients.

54.    Defendants also set customers up for 90-day orders automatically, without the customer requesting a 90-day order.

55.    Moreover, when a physician's prescription is written for a certain number of a product per day, but the state where the customer lives allows for a higher number of that product per day, Defendants will re-write the prescription for the highest amount allowed and create a medical necessity letter and other documentation, which is sent to the physician for approval.

56.    For example, if a prescription is written for the use of 3 of a product per day (approximately 90 per month), but the customer lives in a state where 240 of those supplies are allowed per month, Defendants re-write a prescription for that customer and create and/or modify letters of medical necessity and other documentation illustrating medical necessity and sends to the physician for approval.

57.    If and when the physician approves the documentation for the 240 of those supplies per month, Medicare and Medicaid are billed based on Defendants' creation of the prescription and creation and/or modification of the letter of medical necessity and other documentation, when the physician did not order that amount of product use originally.

58.    For example, on information and belief, Amber Foster, a vice president of sales for Defendant, and Lesley Dally, a regional sales manager for Numotion, participate and/or train other representatives of Defendants on this method to create and/or modify prescriptions and letters of medical necessity to supply customers with the maximum legally, allowable products and supplies, despite the physician originally signing a prescription for less products and/or supplies (or in this case, the medically necessary amount as determined by the physician during and/or shortly after visiting with his/her patient).

59.    Defendants also receive rebates, discounts, and/or credits from manufacturers, shippers, and/or other third parties, but do not provide Medicare or Medicaid with notice of or information regarding such rebates, discounts, and/or credits when such rebates, discounts, and/or credits result from or relate to payments made to Defendants by Medicare or Medicaid.

60.    On information and belief, when revenues are not as high as Defendants would desire, Defendants insert fictitious revenue for supplies and/or equipment that was previously written off to pad their revenues and make their profits appear better to investors.

61.    Defendants were and are billing Medicare and Medicaid for non-covered supplies, equipment, and services.

## VI.  LEGAL AUTHORITIES

62.     All federal healthcare programs are covered by 42 USC 1320(a) et seq., enacted in 2010 as part of the Patient Protection and Affordable Care Act (PPACA), and is within the definition of Federal healthcare program, 42 USC 1320 a-7b(f), et seq. Therefore, the giving or receiving of kickbacks or renumeration to encourage the purchase of non-medically necessary medical devices and/or supplies is a false claim within the new statutory definition, as well as the case law regarding implied certification. Both prevent the Defendants from being eligible to submit claims for payment by, or to receive money from, the government, even under contract for goods and services.

63.     Implied certification is a theory of liability.

64.     The first case of this kind was upheld in 1993, when Judge Carl B. Rubin, United States District Court Judge for the Southern District of Ohio, denied Defendants' motion to dismiss in *United States ex rel. Roy v. Anthony*, which alleged that claims submitted pursuant to a violation of the Medicare Fraud & Abuse/ Anti-Kickback statute[1] give rise to False Claims Act liability, without regard to whether the service itself was allowable, because the defendants had violated their agreement to abide by all Medicare statutes and regulations as a condition of participation in the Medicare program.[2] In the more than

---

[1] 42 U.S.C. § 1320a-7b(b).

[2] *United States ex rel. Roy v. Anthony*, 914 F. Supp. 1504 (S.D. Ohio 1994).

twenty years since that decision, courts across jurisdictions have agreed that schemes in violation of Anti-Kickback and Stark laws to induce payment from the United States create liability under the False Claims Act.[3]

65.     Two of the most prominent of those cases are *United States ex rel. Pogue v. American Healthcorp., Inc.,*[4] and *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp*[5]. In *Pogue*, the Middle District of Tennessee Court found that the Defendants' continued participation in the Medicare program constituted an "implied certification that [it] will abide by and adhere to all statutes, rules, and regulations governing that program."[6]

66.     The Middle District of Tennessee decision in *Pogue* was reaffirmed by the District of Columbia.[7] After the 1996 decision, *Pogue* was transferred from the Middle District of Tennessee to the District of Columbia as part of the Multi-District Litigation against HCA-

---

[3] *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997), *on remand*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 614 (N.D. Ill. 2003), *quoting Mikes v. Straus*, 84 F. Supp. 2d 427, 434 (S.D.N.Y. 1999); *United States ex rel. Barrett v. Columbia/ HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 32-33 (D. D.C. 2003); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of Am., Inc.*, 238 F. Supp. 2d 258 (D. D.C. 2002); *United States ex rel. Goodstein v. McLaran Regional Medical Center*, 2001 U.S. Dist. LEXIS 2917 (E.D. Mich. 2001); *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000); *United States ex rel. Bidani v. Lewis*, 1998 U.S. Dist. LEXIS 20647 *29-30 (N.D. Ill. 1999); *Gublo v. Novacare, Inc.*, 62 F. Supp. 2d 347 (D. Mass. 1999); *United States ex rel. Franklin v. Parke-Davis*, 147 F. Supp. 2d 39 (D. Mass. 2001); *United States ex rel. Showell v. Philadelphia AFL*, 2000 U.S. Dist. LEXIS 4960 (E.D. Pa. 2000); *United States ex rel. Pogue v. American Healthcorp., Inc.*, 914 F. Supp. 1507 (M.D. Tenn. 1996); *United States ex rel. Roy v. Anthony*, 914 F. Supp. 1504 (S.D. Ohio 1994). *Accord United States v. DBB, Inc., G.S. Care Corp.*, 180 F.3d 1277 (11th Cir. 1999) (freezing assets of defendants with conduct near identical to that alleged here); *United States v. Killough*, 848 F.2d 1523, 1525-1526 (11th Cir. 1988) (criminal kickback violations which cause the Government to make improper payments to contractors violate the False Claims Act); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp. 2d 1017 (S.D. Tex. 1998).
[4] 914 F. Supp. 1507 (M.D. Tenn. 1996), *aff'd*, 238 F. Supp. 2d 258 (D. D.C. 2002).
[5] *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998).
[6] *Pogue*, 914 F. Supp. At 1509.
[7] *Id.*

the Healthcare Company, whose wholly owned subsidiary, West Paces Medical Center, is a Pogue defendant. HCA West Paces' co-defendant, Diabetes Treatment Centers of America ("DTCA") moved the D.C. Court for judgment on the pleadings, based on its theory that intervening law- including the decisions in *United States ex rel. Siewick v. Jamieson Science and Engineering, Inc.*[8] and *United States ex rel. Straus*[9] required the Court to reconsider and reject the Middle District of Tennessee's 1996 determination that the defendants' violations of anti-kickback laws rendered the claims false. The D.C. Court declined to do so, instead reaffirming the 1996 decision as the law of the case and accepting it as the law of the District of Columbia.[10] The Court specifically rejected DTCA's contention that implied certification had been rejected by the courts.[11]

67.    Instead, the D.C. Court found the decisions cited by DTCA to be fully consistent with the implied certification theory adopted in *Pogue* that certification can be implied from silence when compliance with the laws at issue "would affect the Government decision to pay."[12] In one of the most detailed analyses of the implied certification theory

---

[8] *Siewick*, 341 U.S. App. D.C. 459, 214 F.3d 1372 (D.C. Cir. 2000).

[9] *Straus*, 274 F.3d 687 (2d Cir. 2001).

[10] *Pogue*, 238 F. Supp. 2d 258, 262-263.

[11] The Court noted that the only court to reject implied certification was the District Court in *United States ex rel. Barmak v. Sutter Corp.*, 2002 U.S. Dist. LEXIS 8509 (S.D.N.Y. 2002), "which did so in dicta on a matter not fully briefed and not squarely before it." *Pogue*, 238 F. Supp. 2d at 266.

[12] *Pogue*, 238 F. Supp. 2d at 263-265. The District of Columbia's conception of "implied certification" has principled limits, which was demonstrated shortly after the Pogue decision. In *United States ex rel. Ortega v Columbia Healthcare, Inc.*, 240 F. Supp. 2d 8, 20 (D. D.C. 2003), the same court dismissed False Claims Act allegations premised on a hospital's noncompliance with the Joint Commissions on Accreditation of Healthcare Organizations (JCAHO) because: "Compliance with the Medicare laws and the regulations promulgated under them is a requirement to participate in Medicare, JCAHO certification is not." In other words, there was no nexus between JCAHO certification and Medicare payment.

since the 1998 decision in *U.S. ex rel. Thompson v. Columbia/HCA*,[13] the Court affirmatively upheld that "violations of the Anti-Kickback and Stark laws can support a claim under the FCA…"[14]

68.    In *Thompson*, the Northern District of Texas Court held both that the mere submission of claims for payment statutorily prohibited by the self-referral Stark statute[15] and the submission of claims with false certification of compliance with Anti-Kickback and self-referral laws violated the False Claims Act.[16] The Northern District of Illinois shares this view, holding first that claims for payment are implied false "where the defendant's certification of compliance with the statutes regulations in question is a condition of receiving funds from the Government."[17] As to whether compliance with the

---

[13] *Thompson*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998).

[14] *Pogue*, 238 F. Supp. 2d at 266. The Court examined such decisions as *United States v. TDC Management Corp.*, 288 F.3d 421 (D.C. Cir. 2002), Ab-Tech Constr. V. United States, 31 Fed. Cl. 429 (1994), and *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999), and concluded that even the strictest construction of implied certification theory (such as that found in *Mikes*) is "in line with [these] courts' requirement that compliance with the statute or regulation must be of such importance that noncompliance would influence the government's decision to pay." *Id.*, 238 F. Supp. 2d at 265-266. In a companion case the following year, the *Pogue* Court reiterated this view. *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 32-33 (D. D.C. 2003).

[15] 42 U.S.C. § 1395.

[16] Thompson is the most detailed exposition thus far of the interplay between the Medicare requirements and violations of the False Claims Act: PPS providers receive interim payments based on claims they submit throughout the year on a per-patient basis for every episode of care. These payments, however, are conditioned on the submission of an annual cost report- the final accounting which itemizes all of the provider's costs for that year and results in a claim for the total amount of program reimbursement. Failure to submit a cost report can result in all interim payments during the cost period being deemed overpayments. 42 U.S.C. § 1395(g). The cost report contains a certification by the provider that "this report and statement are true, correct, complete" and that "the services identified in this cost report were provided in compliance with such laws and regulations." 42 CFR § 413.24(f)(4)(iv). False certifications on cost reports violate the False Claims Act. *Thompson*, 20 F. Supp. 2d at 1046, 1049. *Thompson* recognized that HHHS conditions the retention of payment as well as a provider's continued eligibility in the program on the accuracy of the cost reports, and cited the express language in the applicable statutes and regulations, as well as to the Declaration of David Goldberg, an acting chief of the Provider Audit Operations Branch at HHS, submitted by the United States. *Id.*, 20 F. Supp. 2d at 1042, *citing* Declaration of Goldberg.

[17] *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 614 (N.D. Ill. 2003), *quoting Mikes v. Straus*, 84 F. Supp. 2d 427, 434) S.D.N.Y. 1999).

Anti-Kickback Act is a condition of receiving Medicare funds, the *Bidani* Court found the answer obvious: "Compliance with the [Anti-Kickback Act] is thus central to the reimbursement plan of Medicare. To state otherwise would be to allow participation and reimbursement for supplies purchased illegally only because the claimant had the luck of not being caught and convicted in the first place."[18] Courts have long held that contractors are liable under the False Claims Act for failure to "turn square corners" with the United States without regard to the existence of affirmative certifications.[19] In the Medicare context, False Claims Act liability routinely has been upheld for claims submitted by providers and suppliers who were violating Medicare laws and regulations, without requiring express certification of compliance with those laws.[20]

---

[18] *Bidani*, 264 F. Supp. 2d at 616.

[19] United States ex rel. A+ Homecare, Inc. v. Medshares Mgm't Group, Inc., 400 F.3d 428, 446 (6th Cir.), cert. denied, 546 U.S. 1063 (2005); United States ex rel. Augustine v. Century Health Servs, Inc., 289 F.3d 409 (6th Cir. 2002); United States ex rel. Varljen v. Cleveland Gear Co., 250 F.3d 426, 430 (6th Cir. 2001), citing United States ex rel. Compton v. Midwest Specialties, Inc., 142 F.3d 296, 302 (6th Cir. 1998). See also Shaw v. AAA Eng'g. & Drafting, Inc., 213 F.3d 519, 531 (10th Cir. 2000); United States ex rel. Oliver v. Parsons Co., 195 F.3d 457, 464-465 (9th Cir. 1999), cert. denied, 530 U.S. 1228 (2000); United States ex rel. Pickens v. Kanawha River Towing, 916 F. Supp. 702 (S.D. Ohio 1996), aff'd, 194 F.3d 1314 (6th Cir. 1999); United States v. TDC Mgmt. Corp., 24 F.3d 292, 296 (D.C. Cir. 1994); United States ex rel. Bryant v. Williams Bldg. Corp., 2001 U.S. Dist. LEXIS 4711 *24 (D. S.D. 2001); BMY-Combat Systems v. United States, 39 Fed. Cl. 109 (Fed. Cl. 1997); United States ex rel. Fallon v. Accudyne Corp., 921 F. Supp. 611 (W.D. Wis. 1995); Ab-Tech Constr., inc. v. United States, 31 Fed. Cl. 429, 434 (1994), aff'd, 57 F.3d 1084 (Fed. Cir. 1995); United States v. Incorporated Village of Island Park, 888 F. Supp. 419, 439-441 (E.D.N.Y. 1995).

[20] United States ex rel. Kneepkins v. Gambro Healthcare, Inc., 115 F. Supp. 2d 35, 43 (D. Mass. 2000); United States ex rel. Showell v. Philadelphia AFL, 2000 U.S. Dist. LEXIS 4960 (E.D. Pa. 2000); United States v. NHC Healthcare Corp., 115 F. Supp. 2d 1149. 1154 (W.D> Mo. 2000); United States ex rel. Wright v. Cleo Wallace Centers, 132 F. Supp. 2d 913, 926 (D. Col. 2000); United States ex rel. Bidani v. Lewis, 1998 U.S. Dist. LEXIS 20647 *29-30 (N.D. Ill. Jan. 3, 1999); United States ex rel. Pogue v. American Healthcorp., Inc., 914 F. Supp. 1507 (M.D. Tenn. 1996); United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma, 945 F. Supp. 1485, 1488 (W.D. Okla. 1996); United States ex rel. Sanders v. East Alabama Healthcare Authority, 953 F. Supp. 1404, 1410-1411 (M.D. Ala. 1996); United States ex rel. Roy v. Anthony, 914 F. Supp. 1504 (S.D. Ohio 1994).

**Liability Attaches for Seeking Funds That Provider Is Statutorily Prohibited**

**From Receiving**

69.     Such certifications are not the only basis for determining the Defendants knowingly submitted false claims to the United States. As *Thompson* recognizes, Defendants' submissions for Medicare payments that they knew they were statutorily prohibited from receiving violate the False Claims Act.[21] Courts have affirmed this proposition time and again.[22]

70.     This fits precisely within the letter and intent of the 1986 Amendments to the False Claims Act. The drafters squarely asserted that "claims may be false even though the services are provided as claimed if, for example, the claimant is ineligible to participate in the program[.]"[23] Courts have followed Congress' wishes, holding that "the False Claims Act was intended to govern not only fraudulent acts that create a loss to the Government, but also those fraudulent acts that cause the Government to pay out sums of money to *claimants it did not intend to benefit.*"[24]

---

[21] *Thompson*, 20 F. Supp. 2d at 1047.

[22] *E.G., United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899 (5th Cir. 1997), *on remand*, 20 F. Supp. 2d 1017 (S.D. Tex. 1998); *United States ex rel. Bidani v. Lewis*, 264 F. Supp. 2d 612, 614 (N.D. Ill. 2003), *quoting Mikes v. Straus*, 84 F. Supp. 2d 427, 434 (S.D.N.Y. 1999); *United States ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 32-33 (D. D.C. 2003); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. Of Am., Inc.*, 238 F. Supp. 2d 258 (D. D.C. 2002); *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000); *United States ex rel. Wright v. Cleo Wallace Centers*, 132 F. Supp. 2d 913, 926 (D. Col. 2000); *United States ex rel. Pogue v. American Healthcorp., Inc.*, 914 F. Supp. 1507 (M.D. Tenn. 1996); *United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma*, 945 F. Supp. 1485, 1488 (W.D. Okla. 1996); *United States ex rel. Sanders v. East Alabama Healthcare Authority*, 953 F. Supp. 1404 (M.D. Ala. 1996); *United States ex rel. Roy v. Anthony*, 914 F. Supp. 1504 (S.D. Ohio 1994).

[23] S. Rep. No. 99-345, 99th Cong., 2d Sess. At 9, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.

[24] *Pogue*, 914 F. Supp. At 1513 (*emphasis supplied*).

71.     Thus, a defendant's continued participation in the Medicare program constitutes an "implied certification that [it] will abide by and adhere to all statutes, rules, and regulations governing the program."[25] Each time the provider submitted a claim related to or derived from its knowing violations of these laws, it violated the implied certification of "continuing adherence to the requirements for participation in the program."[26]

72.     As was explained in *Pogue* and *Ab-Tech*, the provider's concealment of the fact that it had violated the terms of its agreement with the United States "caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the ... program."[27] In essence, the United States was duped into paying entities it believed to be eligible for payment, for patients the defendant never would have obtained *but for* illegal payments for which the Defendants were not eligible to apply for. This is precisely what the False Claims Act was designed to prevent.

73.     At the outset, the focus on the financial impact to the United States is wrong as a matter of law. A half-century's jurisprudence establishes that actual damages are not an element of recovery under the False Claims Act.[28]

74.     More importantly, such arguments are fundamentally backwards, and represent a basic misunderstanding of the reimbursement provisions of federal health care programs.

---

[25] *Pogue*, 914 F. Supp. At 1509.
[26] *Id.*, 914 F. Supp. at 1510, *quoting Ab-Tech Constr., Inc., v. United States*, 31 Fed. Cl. 429 (1994), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995). *See also BMY-Combat Systems Division of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 125 (Ct. Cl. 1997).
[27] 31 Fed. Cl. at 434.
[28] *E.G., RexTrailer Co. v. United States*, 350 U.S. 148, 152-153 (1956); *Varljen*, 250 F.3d at 431; §14-3(a)(4), "Actual Damages Are Not a Necessary Element under the False Claims Act," *infra*.

The relevant inquiry is not whether the Government would or would not have paid the claims (or in what amount), but whether the providers had authority to seek payment in the first place.[29] The proper focus is defendant's knowing conduct at the time the claim was submitted.[30] Medicare payment is not an entitlement, requiring the Government to prove why denied claims are exempt from such entitlement. Rather, providers receive payment only for "covered" services, as defined by Medicare law and regulations. If covered services are not provided, providers have no basis for payment.[31] A "covered service" includes, by definition, *only* services that were furnished by a supplier "that was, at the time it furnished the services, qualified to have payment made to them."[32] By law, providers engaged in illegal conduct and referral schemes never should have submitted these claims in the first place.

75.    Such providers are as liable as any other Government contractor for their concealment of its Medicare law violations while seeking Medicare money.[33] Courts routinely hold persons who deal with the Government to the letter of their agreement,

---

[29] Following *Thompson*, the Fifth Circuit rejected these "but for" arguments. *United States v. Southland Mgmt. Corp.*, 288 F.3d 665, 6778-679 (5th Cir. 2002), *reh'g en banc granted*, 307 F.3d 352 (5th Cir. 2002), *aff'd on other grounds*, 326 F.3d 669 (5th Cir. 2003).

[30] As the *Southland* Court explained: "[T]he falsity of a claim is determined at the time of submission… Fortuities in the Government's subsequent process have no effect on the objective truth or falsity of the claimant's asserted entitlement, and should thus have no effect on the claimant's potential liability under the Act." *Southland*, 288 F.3d at 681. Moreover, if the provider violates its "continuing duty to comply with [Medicare] regulations on which the payment is conditioned," the provider [for its claims] is liable under the FCA. *United States ex rel. Augustine v. Century Health Servs, Inc.*, 289 F.3d 409, 415 (6th Cir. 2001).

[31] 42 C.F.R. § 424.5(a).

[32] 42 C.F.R. § 424.5(a)(2).

[33] The rationale of False Claims Act decisions in the Government contract arena is instructive in the Medicare context. *United States ex rel. Wright v. Cleo Wallace Centers*, 132 F. Supp. 2d 913, 926 (D. Col. 2000).

without regard to whether they went through the extra step of affirmatively certifying compliance that was already required of them (and without regard to whether their noncompliance rendered the delivered product defective).[34] These holdings are equally applicable in the Medicare context.

76.    Indeed, courts across multiple jurisdictions have applied such principles to Medicare claims- including those based in violations of kickback laws- when there has been no affirmative certification of compliance with Medicare laws and regulations.[35] The

---

[34] *United States ex rel. Augustine v. Century Health Servs., Inc.*, 289 F.3d 409 (6th Cir. 2001); *United States ex rel. Varljen v. Cleveland Gear Co.*, 250 F.3d 426, 430 (6th Cir. 2001), *citing United States ex rel. Compton v. Midwest Specialties, Inc.*, 142 F.3d 296, 302 (6th Cir. 1998) (upholding false claims for product which was not tested as required by contract, regardless of whether the product was defective). *See also Shaw v. AAA Eng'g. & Drafting, Inc.*, 213 F.3d 519, 531 (10th Cir. 2000) (false submission of invoices for full payment on the photography services contract knowing it had failed to comply with the contract requirements for the disposal of silver removed during film processing); *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464, 465 (9th Cir. 1999), *cert. denied*, 530 U.S. 1228 (2000) (false claims based in the omission of cost information in violation of cost accounting regulations); *United States ex rel. Pickens v. Kanawha River Towing*, 916 F. Supp. 702 (S.D. Ohio 1996), *aff'd*, 194 F.3d 1314 (6th Cir. 1999) (seeking payment under dam construction contract without disclosing violation of contract requirements implementing Clean Water Act violates False Claims Act); *United States ex rel. Bryant v. Williams Bldg. Corp.*, 2001 U.S. Dist. LEXIS 4711*24 (D. S.D. 2001) ("Withholding [that violated contract clause requiring disclosure of discovery of asbestos], while simultaneously seeking payment under the [bathroom remodeling] contract, appears to this Court to be the very essence of a false claim"); *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611 (W.D. Wis. 1995) (failure to perform testing required by contract while making full clam for payment of modular pack mine system components results in submission of false claim). In *United States v. Incorporated Village of Island Park*, for example, the Court held that every monthly demand for individual mortgages under a Government housing program was false because the mortgages were *fraudulently selected* for the program in violation of the contract requirements. 888 F. Supp. 419, 439-441 (E.D.N.Y. 1995). Here, patients were fraudulently selected as part of Defendants' illegal kickback scheme. In *Ab-Tech Constr., Inc. v. United States*, the Court found that submission of payment vouchers under a construction contract were made false by a contractor's failure to disclose a joint venture agreement, as was required for participation in the Small Business Administration program under which the contract was awarded. 31 Fed. Cl. 429 (1994), aff'd, 57 F.3d 1084 (Fed. Cir. 1995). The Medicare program has similarly required that suppliers do not enter into financial arrangements with third parties in return for the provision of services funded by Medicare.

[35] *Augustine*, 289 F.3d 409; *United States ex rel. Kneepkins v. Gambro Healthcare, Inc.*, 115 F. Supp. 2d 35, 43 (D. Mass. 2000) (claims incident to violations of Anti-Kickback law establish a claim under the False Claims Act because "[s]ubmitting a claim under the false pretense of entitlement is fraudulent"); *United States ex rel. Showell v. Philadelphia AFL*, 2000 U.S. Dist. LEXIS 4960 (E.D. Pa. 2000) ("violation of Anti-Kickback Statute may serve as basis for a claim under the False Claims Act"); *United States ex rel. Wright v. Cleo Wallace Centers*, 132 F. Supp. 2d 913, 926 (D. Col. 2000) (claims for psychiatric treatment made false by Defendant's violations of licensing requirements in relation to a swing-bed plan: "person who knowingly submits [Medicaid] claims... while not in compliance with all relevant laws... may constitute a false claim under the False Claims Act, even without an affirmative... false statement of such compliance"); *United States v. NHC Healthcare Corp.*, 115 F. Supp. 2d 1149

Page | 21

reasoning is simple: The Defendants violated Medicare laws in order to induce payment of Medicare funds. Such conduct violated the terms of its agreement with the United States.

77.　These terms are as plain as the standard contractual clauses imposed on every defense contractor. Providers enter into provider agreements in order to gain a billing number by which to submit claims for payment. This agreement gives them license to participate in the Medicare and Medicaid program, or here the FEP, while federal law and regulation lay out the program's requirements.[36] As the D.C. Circuit aptly explained: "it is the *statute* which sets forth the extent of the Government's obligation- the contract only implements the timing and pace of the payment of that obligation."[37] Violations of Medicare laws and regulations strike at the heart of the providers' agreement with the

---

(W.D. Mo. 2000) (billing by nursing home while grossly violating essential agreement with United States with substandard care established False Claims Act violations); *United States ex rel. Bidani v. Lewis*, 1998 U.S. Dist. LEXIS 20647 (N.D. Ill. 1999) (relator states false claim by Part B supplier based on kickback violations for which Government would have withheld payment); *United States ex rel. Pogue v. American Healthcorp., Inc.*, 914 F. Supp. 1507 (M.D. Tenn. 1996), aff'd, 238 F. Supp. 2d 258 (D. D.C. 2002) (false claims arising from failure to disclose illegal kickbacks and self-referrals); *United States ex rel. Aranda v. Community Psychiatric Centers of Oklahoma*, 945 F. Supp. 1485 (W.D. Okla. 1996) (claims for psychiatric treatment while failing to meet quality of care standards forms the basis of False Claims Act claim); *United States ex rel. Sanders v. East Alabama Healthcare Authority*, 953 F. Supp 1404 (M.D. Ala. 1996) (knowing submission of Medicare claim by improperly licensed hospital constitutes submission of false claims); *United States ex rel. Roy v. Anthony*, 914 F. Supp. 1504 (S.D. Ohio 1994) (kickbacks in connection with submission of Medicare payments are false). *Cf. United States ex rel. Watson v. Connecticut General Life Ins. Co.*, 2004 U.S. App. LEXIS 1736 (3d. Cir. 2004); *United States ex rel. Mikes v. Straus*, 274 F.3d 687 (2d Cir. 2001); *United States ex rel. Barmak v. Sutter Corp.*, 2002 U.S. Dist. LEXIS 8509 (S.D.N.Y. 2002).

[36] The scope and extent of the rights under a provider agreement, analogous to a license or permit, are "clearly subject, however, to all applicable regulations." *In Re Psychotherapy and Counseling Center*, 195 B.R. 522, 532 (Bankr. D. D.C. 1996).

[37] *United States v. Consumer Health Services of America, Inc.*, 108 F.3d 390, 396 (D.C. Cir. 1997) (*emphasis on original*). *See also In Re Consumer Health Services of America, Inc.*, 171 B.R. 917, 920 (Bankr. D. D.C. 1994) (the required Provider Agreement together with the overall scheme under the Medicare statute and regulations… constitutes an executory contract… the right to recoupment… is in the nature of a contract right and not a statutory entitlement).

United States, and should support False Claims Act liability.[38]

78.     The anti-kickback provisions were enacted as part of Title XVIII of the Social Security Act in 1972.[39] They were introduced to "give a clear, loud signal to the thieves and the crooks and the abusers that we mean to call halt to their exploitation of the public purse."[40] The subsequent amendments were intended to "ensure that signal will be heard in unmistakable tones."[41]

79.     Kickbacks are not merely an unethical practice Congress sought to deter through legislation unrelated, as the defense bar would have it, to the payment of claims. Kickback legislation was motivated by the basic recognition that claims submitted pursuant to kickbacks lead to the misuse of Medicare funds and the rising cost of the program. The legislative history is straightforward on this point:

> Existing law provides specific penalties under the Medicare and Medicaid programs for certain practices that have long been regarded by professional

---

[38] False Claims Act liability "can attach if the claimant violates its continuing duty to comply with the regulations on which payment is conditioned." *Augustine*, 289 F.3d at 415. *Accord United States ex rel. Wright v. Cleo Wallace Ctrs.*, 132 F. Supp. 2d 913, 926 (D. Colo. 2000) ("[A] person who knowingly submits claims to the government for the purpose of acquiring federal Medicaid funds while not in compliance with all relevant laws, rules and regulations may constitute a false claim under the FCA, even without an affirmative or express false statement of such compliance."). *But see United States ex rel. Joslin v. Community Home Health of Maryland, Inc.*, 984 F. Supp. 374, 385 (D. Md. 1997) (emphasis in original) ("The relevant statute and regulation simply state that such compliance is a condition of participation in the Medicare program, but no evidence has been presented suggesting that *certification* of such compliance is a condition to *payment*, the *sine qua non* of FCA liability."); *United States ex rel. Cooper v. Gentiva Health Servs.*, 2003 U.S. Dist. LEXIS 20690 (W.D. Pa. 2003) (application for billing privileges involves obligations for participation, not payment); *Lum v. Vision Service Plan*, 104 F. Supp. 2d 1237, 1241-1242 (D Haw. 2000) (citations omitted) ("It is not at all clear that certification was a prerequisite for payment to VSP, but, even if it was, a mere regulatory violation would not give rise to a viable False Claims Act action. There are administrative and other remedies for regulatory violations. Absent express false certifications upon which funding is conditioned, the False Claims Act provides no remedy.")

[39] Pub. L. 92-603, 86 Stat. 1329 (October 30, 1972). They were recodified in Title XI as part of 1987 Amendments to the Social Security Act, called the Medicare and Medicaid Protection Act of 1987. Pub. L. No. 100-93, 100 Stat 680 (August 18, 1987).

[40] 123 Cong. Rec. 31767 (September 30, 1977) (Remarks of Sen. Talmadge).

[41] *Id.* (Remarks of Sen. Talmadge regarding 1977 Amendments).

> organizations as unethical, which are unlawful in some jurisdictions, and *which contribute significantly to the cost of the programs.* Such practices [include the] submission of false claims or the soliciting, offering, or acceptance of kickbacks or bribes...[42]

> In whatever form it is found, *fraud in these health care financing programs... cheats taxpayers who must ultimately bear the financial burden* of misuse of funds in any Government-sponsored program.[43] [*Kickbacks*] are widespread in Medicaid... [and are a] pervasive practice which *picks the taxpayer's pocket.*[44]

80.     One of the reasons for the rising costs, resulting from illegal kickbacks is their relationship to unnecessary claims. In fact, in 1977, a Special Committee was convened to examine just this issue, and what it found convinced them that aggressive action was necessary to stop this kind of abuse *before* it led to the submission of claims. As the Committee's Report summarized:

> This report deals with what must be the most commonly occurring scheme to defraud the Medicaid program. The word "kickbacks" connotes a practice that has been found to some degree in every aspect of the Medicaid system. *Such rebates have the effect of increasing the cost of the Medicaid program. They undermine the quality of services which are offered since operators become more concerned with rebates than with care...*[45]

---

[42] H. Rep. 95-393, 95th Cong., 1st Sess. at 52-53, *reprinted in,* 1977 U.S.C.C.A.N. 3039, 3055 *see also* S. Rep. 95-453, 95th Cong., 1st Sess. at 11 (*emphasis added*).

[43] H. Rep. 95-393, 95th Cong., 1st Sess. at 44, *reprinted in,* 1977 U.S.C.C.A.N. 3039, 3047 (*emphasis added*).

[44] S. Rep. 95-320, *Kickbacks Among Medicaid Providers, A Report of the Special Committee on Aging* 95th Cong., 1st Sess. at 28 (June 30, 1977) (*emphasis added*).

[45] S. Rep. 95-320, *Kickbacks Among Medicaid Providers, A Report of the Special Committee on Aging* 95th Cong., 1st Sess. at 2 (June 30, 1977) (*emphasis added*). Providers described to the Committee a "hungry-for-business" mentality driving kickbacks. S. Rep. 95-320, *Kickbacks Among Medicaid Providers, A Report of the Special Committee on Aging* 95th Cong., 1st Sess. at 8 (June 30, 1977). Kickbacks can also lead to increased costs when providers "make up the difference" for monies spent on kickbacks with increased rates: A pharmacist reported to the Committee, "You would be absolutely amazed at the amount of Government money being sopped up by these extra billings." S. Rep. 95-320, *Kickbacks Among Medicaid Providers, A Report of the Special Committee on Aging* 95th Cong., 1st Sess. at 12 (June 30, 1977).

81.   This scheme, in effect at the commencement of the new activity, renders the Defendants ineligible to receive or apply for government funds in a Federal Healthcare Program.

### Civil Penalties

82.   In 1986, the penalty provision of the FCA was amended to increase the amount of each penalty to not less than $5,000 and not more than $10,000.[46] As a result of an administrative increase effectuated in 1999, the penalty range for false claims made on or after September 29, 1999, is $5,500 to $11,000.[47]

83.   On November 2, 2015, President Obama signed into law the Federal Civil Penalties Inflation Act of 2015.[48] The Act requires agencies to adjust the level of civil monetary penalties with an initial "catch-up" adjustment through an interim final rulemaking and to make subsequent annual adjustments for inflation.[49] Agencies were to publish their interim final rules by July 1, 2016, and the new penalty levels took effect no later than August 1, 2016.[50]

84.   On June 30, 2016, the Department of Justice published the new post-adjustment minimum and maximum FCA penalties as $10,781 and $21,563, respectively.[51] These

---

[46] 31 U.S.C. §3729(a)(1). These "civil penalties" were called "forfeitures" prior to 1986.
[47] 28 C.F.R. §85.3(a)(9).
[48] Section 701 of the Bipartisan Budget Act of 2015, Pub. L. No. 114-74, 129 Stat. 584 (Nov. 2, 2015). This section is now codified at 28 U.S.C. §2461 note. *See* Memorandum from Shaun Donovan, Executive Director, Office of Management and Budget, to Heads of Executive Departments and Agencies, Implementation of the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, No. M-16-06 (Feb. 25, 2016).
[49] *Id.*
[50] *Id.*
[51] Civil Monetary Penalty Inflation Adjustment, 81 Fed. Reg. 42, 491, 42, 494 (June 30, 2016).

amounts apply to penalties assessed after August 1, 2016 for violations that occurred after November 2, 2015, the date of the Act.52

85. On February 3, 2017, the Department of Justice announced that, effective immediately, the minimum per-claim penalty for FCA violations would increase to $10,957, and the maximum per claim penalty would increase to $21,916.53 Again, these amounts apply to penalties assessed after February 3, 2017 to violations that occurred after November 2, 2015, the date on which the Act was signed.54

86. The following table illustrates the annual changes to the amount of the FCA's civil penalties.

| DATE PENALTIES ASSESSED | MINIMUM PENALTY | MAXIMUM PENALTY |
|---|---|---|
| Assessments made anytime to the present for violations from 9/29/1999 to before 11/2/2015; *and* Assessments made before 8/1/2016 (for violations after 11/2/2015)[55] | $5,500 | $11,000 |
| 8/2/2016 to 2/3/2017 (for violations after 11/2/2015)[56] | $10,781 | $21,563 |

---

[52] *Id.* at 42, 498.
[53] Civil Monetary Penalty Inflation Adjustment for 2017, 82 Fed. Reg. 9131, 9133 (Feb. 3, 2017).
[54] *Id.* at 9132.
[55] 28 C.F.R. §85.3(a)(9); 81 Fed. Reg. at 42,494, 42,498.
[56] 28 C.F.R. §85.5; 81 Fed. Reg. at 42,494, 42,498.

| | | |
|---|---|---|
| 2/4/2017 to 1/15/2018 (for violations after 11/2/2015)[57] | $10,957 | $21,916 |

87.     Therefore, the Defendants, each of them, should be assessed civil penalties for each false prescription submitted to the government for payment. All of these occurrences were after November 2, 2015, which means that the minimum of $10,957 per occurrence, and a maximum of $21,916 per occurrence, of false prescriptions submitted for payment should be assessed. This Act refers to Federal Healthcare Programs which include, but are not limited to, Medicare, Medicaid, and Federal Employee Programs as all inclusive.

88.     Perhaps the earliest statement of the "implied certification" theory comes from the Federal Circuit. In Ab-Tech Construction v. United States,[58] a small, minority-owned construction company was awarded a contract by the Small Business Administration (SBA) for the construction of a data processing facility for the U.S. Army Corps of Engineers.   As a condition of the contract award, Ab-Tech signed a "Statement of Cooperation" promising to comply with the SBA's requirements and regulations for continuing eligibility to participate in the SBA program- a program meant to advantage small, minority owned businesses.

---

[57] 28 C.F.R. §85.5; 82 Fed. Reg. at 9131-32, 9133.
[58] 31 Fed. Cl. 429 (Fed. Cir. 1994). *See also* James B. Helmer, Jr. & Robert M. Rice, *The False Claims Act and Implied Certification: An Update on the State of the Law*, 34 False Claims Act & *Qui Tam* Q. Rev. 51 (2004).

89.     One of the regulations allowed the SBA to terminate Ab-Tech's participation in the program if it entered into a joint venture agreement without prior SBA approval. Despite the regulation, Ab-Tech did in fact forge a joint venture without notifying the SBA. This conduct violated the SBA regulation, yet Ab-Tech continued to submit claims for progress payments.

90.     In subsequently finding Ab-Tech liable under the FCA, the court found it irrelevant that Ab-Tech was not required to explicitly recertify continuing adherence to all SBA regulations when submitting progress payments. The claims were false nonetheless:

> The payment vouchers represented an implied certification by Ab-Tech of its continuing adherence to the requirements for participation in the [SBA] program. Therefore, by deliberately withholding from SBA knowledge of the prohibited contract arrangement... Ab-Tech not only dishonored the terms of its agreement with that agency but, more importantly, caused the Government to pay out funds in the mistaken belief that it was furthering the aims of the [SBA] program. In short, the Government was duped by Ab-Tech's active concealment of a fact vital to the integrity of that program. The withholding of such information – information critical to the decision to pay – is the essence of a false claim. [59]

91.     The district court in *United States ex rel. Pickens v. Kanawha River Towing*[60] explained the concept of implied certification succinctly: "[A] contractor who knowingly fails to perform a material requirement of its contract... yet seeks or receives payment as

---

[59] *Ab-Tech Constr.*, 31 Fed. Cl. At 434. The concept of "implied certification" honors the broad purpose of the FCA, which, as the U.S. Supreme Court long ago recognized, is designed to reach "all fraudulent attempts to cause the Government to pay out sums of money." *Id.* at 433 (citing *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968)).
[60] 916 F. Supp. 702 (S.D. Ohio 1996), *aff'd on other grounds*, 194 F.3d 1314 (6ᵗʰ Cir. 1999).

if it had fully performed without disclosing the non-performance, has presented a false claim to the Government man may be liable therefore."[61] In other words, a demand for payment by a government contractor constitutes an implicit representation that the contractor has complied with the requirements of the government contract.[62]

92.    A false claim exists where a contractor makes claims for full payment, but withholds from the government information about noncompliance with required inspection specifications that were critical to the decision to pay for the items purchased. It is not necessary that there be express false claims on the government's DD250 forms, because implied representations fall into the category of acts that constitute false of fraudulent claims. Deliberate withholding of information is sufficient to prove an FCA violation.[63]

93.    A request for payment under the terms of the contract is a representation of compliance with the contract terms- that is, the very act of submitting a claim for payment carries with it assurances, whether explicitly given or not, that the claimant has complied with all conditions associated with the payment sought.[64] Thus, although express certifications may be powerful evidence of both falsity and knowledge, they are not always needed to state a claim under the FCA. Often termed "implied false claims," such violations

---

[61] 916 F. Supp. At 707. See *United States ex rel. Fallon v. Accudyne Corp.*, 921 F. Supp. 611, 627 (W.D. Wis. 1995). See also *United States v. TDC Mgmt. Corp.*, 24 F.3d 292, 296 (D.C. Cir. 1994) (liability could attach as matter of law under FCA as result of failure to disclose material noncompliance); *Imperial Meat v. United States*, 316 F.2d 435 (10th Cir. 1963) (finding contractor criminally liable for providing inferior grade of meat notwithstanding that its invoice made no representation concerning grade of meat).
[62] *Pickens*, 916 F. Supp. At 707; *Fallon*, 921 F. Supp. At 627. *But see United States ex rel. Joslin v. Community Home Health*, 984 F. Supp. 374, 375-78 (D. Md. 1997).
[63] *BMY-Combat Sys. Div. of Harco v. United States*, 38 Fed. Cl. 109, 124 (1997); *Sterling Millwrights v. United States*, 26 Cl. Ct 49, 95 (1992).
[64] *United States v. Rivera*, 55 F.3d 703, 710 (1st Cir. 1995).

Page | 29

of the FCA must be actionable in order to protect the public coffers from some of the most outrageous and intentional false billing schemes. For the purposes of the Act, an implied representation on an invoice that work has been completed pursuant to the contract requirements may constitute a false claim for payment.[65] In order to show that an implied representation violates the FCA, there must be proof by a preponderance of the evidence that the contractor knowingly withheld information.[66] A false certification of compliance with a statute, regulation, or guideline, whether express or implied, may violate the Act.[67] However, courts distinguish between regulations, statutes, and guidelines that serve as conditions of payment versus conditions of participation.[68] If a regulation is only a condition of participation, courts were unlikely to find any implied certification. As noted by the Tenth Circuit, the difference between a participation condition and a payment condition is that violation of the former may result in removal from the government program, whereas violation of the latter might cause the government to refuse payment.[69]

94.      But the debate over conditions of participation being required for an implied

---

[65] *United States ex rel. Augustine v. Century Health Servs.*, 289 F3d 409 (6th Cir. 2002); *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 124 (Cl. Ct. 1997) (citing *Ab-Tech Constr., Inc. v. United States*, 31 Fed. Cl. 429, 433-34 (1994), *aff'd*, 57 F.3d 1084 (Fed. Cir. 1995); *Daff v. United States*, 31 Fed. Cl. 682, 695 (1994), *aff'd* 8 F.3d 1566 (Fed. Cir. 1996)).

[66] *BMY-Combat Sys. Div. of Harsco Corp. v. United States*, 38 Fed. Cl. 109, 124 (Cl. Ct. 1997) (citing *Daff v. United States*, 31 Fed. Cl. 682, 688-89 (1994); *Sterling Millwrights v. United States*, 26 Cl. Ct. 49, 95 (1992)).

[67] *Augustine*, 289 F.3d at 416; *United States ex rel. Mikes v Straus*, 274 F.3d 687, 697 (2d Cir. 2001), *abrogated by Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016); *Shaw v. AAA Eng'g & Drafting*, 213 F.3d 519, 531 (10th Cir. 2000); *United States ex rel. Watson v. Connecticut General Life Ins. Co.*, 2003 U.S. Dist. LEXIS 2054, at *42-43 (E.D. Pa. Feb. 11, 2003).

[68] *United States ex rel. Wilkins v. United Health Grp.*, 659 F.3d 295, 308-09 (3d Cir. 2011) (citing *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001), *abrogated by Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016)); *United States ex rel. Conner v. Salina Reg'l Health Ctr.*, 543 F.3d 1211, 1220 (10th Cir. 2008).

[69] *Conner*, 543 F.3d at 1220.

certification claim became a matter of historical note only with the Supreme Court's *Escobar* decision eschewing such analysis.

95.     On June 16, 2016, the U.S. Supreme Court issued a unanimous pronouncement on the FCA in *Universal Health Services, Inc. v. United States ex rel. Escobar.*[70] The Court, in an opinion crafted by Justice Thomas, found that implied certification, in certain circumstances, can be a basis for FCA liability when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose its noncompliance with a statutory, regulatory, or contractual requirement, such that the omission renders the representation misleading.[71] Although the Court got it right in deciding that implied certification is a viable theory of liability under the FCA, it left some waters muddy by declining to resolve the full scope of this liability theory. The Court vacated and remanded the First Circuit's decision because the latter's interpretation of Section 3729(a)(1)(A)'s materiality standard differed from the Court's newly minted interpretation of that provision.[72]

96.     The relators in *Escobar* were the mother and stepfather of Yarushka Rivers, a girl who developed behavioral problems in 2004.[73] Rivers received counseling services as a Medicaid beneficiary at Arbour Counseling Services, a mental health facility in

---

[70] 136 S. Ct. 1989 (2016).

[71] *Id.* at 1995. This holding overturned Second and Seventh Circuit decisions. *United States ex rel. Mikes v. Straus,* 274 F.3d 687 (2d Cir. 2001); *United States ex rel. Nelson v. Sanford-Brown,* 788 F.3d 696 (7th Cir. 2015).

[72] *Escobar,* 136 S. Ct. at 1996. On remand, the First Circuit determined that the relator had properly pled materiality and remanded the case to the trial court. *United States ex rel. Escobar v. Universal Health Servs., Inc.,* 842 F.3d 103 (1st Cir. 2016).

[73] *Escobar,* 136 S. Ct. at 1996-97.

Massachusetts owned and operated by a subsidiary of the petitioner Universal Health Services.[74] A total of five medical professionals treated Rivers while she was a patient of the facility.[75] In May 2009, Rivers had an adverse reaction to medication prescribed to her to treat bipolar disorder.[76] She later suffered two seizures and died in October 2009, at the age of 17.[77]

97.    It was later revealed to Rivers' mother and stepfather that few of Arbour's employees were in fact licensed to provide mental health counseling, and that there was minimal supervision of those employees.[78] Of the five 'professionals' who treated Rivers, only one was properly licensed.[79] For example, the practitioners who diagnosed Rivers as bipolar, who claimed she was a psychologist with a Ph.D., actually got her degree from an unaccredited Internet college, and her application to be licensed by the Commonwealth of Massachusetts was denied.[80] The practitioner who prescribed medication to Rivers, who was held out as a psychiatrist, was actually a nurse who had no authority to prescribe medication.[81] All told, 23 of Arbour's employees lacked licenses to provide mental health services, yet Arbour represented to the Massachusetts Medicaid program that it did have properly licensed personnel and proper supervision requirements for its staff when it

---

[74] *Id.*

[75] Universal Health Servs., Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989 (2016).

[76] *Id.*

[77] *Id.* at 1997.

[78] *Id.*

[79] *Id.*

[80] *Escobar*, 136 S. Ct. at 1997.

[81] *Id.*

submitted claims for payment to the program.[82]

98.     The overwhelming majority of courts that have addressed the implied certification theory of liability required that, in order for a claim to be actionable under the theory, the statute, regulation, or contractual term violated must have been a condition of payment. The Supreme Court changed that requirement in several respects.

99.     First, no longer do the legal requirements violated need to be expressly designated as conditions of payment.[83] Instead, failure to comply with such requirements that are not expressly conditions of payment can result in liability.[84] Second, an express condition of payment will not always result in liability. Instead, courts are to look to whether the defendant violated a requirement that it knew was material to the government's decision to pay.[85] Although the Court did not resolve the full scope of the implied certification theory of liability, it created a two-part test for determining when misleading half-truths make a claim false:

> (1) The claim must not merely request payment, but also must make specific representations about the goods or services provided; and
> (2) The defendant's failure to disclose noncompliance with the material statutory, regulatory, or contractual requirements makes those representations misleading half-truths.[86]

100.    The Supreme Court questioned whether a defendant is liable under the implied

---

[82] *Id.*

[83] *Id.* at 1996.

[84] *Id.*

[85] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

[86] *Id.* at 2001.

certification theory only if it fails to disclose the violation of a contractual, statutory, or regulatory provision that the government expressly designated a condition of payment.[87] The Court answered the question in the negative, but again, in doing so, it put the concept of materiality in a state of flux.

101.    The Court noted that neither the text of Section 3729(a)(1)(A) nor the common law meaning of "fraud" limits liability only to those claims involving misrepresentations or fraud in violation of express conditions of payment.[88] The Court also found that the FCA's materiality requirement did not support the defendant's argument that statutory, regulatory, and contractual requirements are not automatically material because they are labelled as conditions of payment.[89] The *scienter* requirement in Section 3729(a)(1)(A) also did not support the defendant's argument, because a defendant can have actual knowledge that a condition is material, without the government expressly calling it a condition of payment.[90]

102.    At first blush, it seems that the Court engrafted into the FCA all of the other elements of common law fraud, which would include damages. However, that is not the case; as the *Neder v. United States*[91] case cited by the Court specifically cautioned (although a point not referenced in the *Escobar* decision), "the common law requirements of 'justifiable reliance' and 'damages,'… plainly have no place in the federal fraud statutes."[92] In addition, the Court noted that reliance and damages are incompatible with such fraud

---

[87] *Id.*
[88] *Id.*
[89] *Id.*
[90] *Escobar*, 136 S. Ct. at 2001.
[91] 527 U.S. 1 (1999).
[92] *Id.* at 24-25 (citing *United States v. Stewart*, 872 F.2d 957, 960 (10th Cir. 1989)).

statutes because they prohibit not just completed fraud, but also schemes to defraud.[93] Like the mail fraud statute at issue in *Neder*, the FCA also prohibits attempts to defraud the government, and as such, reliance and damages need not be shown. The plain language of the FCA bears this out, as it imposes liability on one who presents or causes the presentment of a false claim that causes damages to the government.

103.    Another overreaching statement in the opinion is Justice Thomas' reliance on *Vermont Agency of Natural Resources v. United States ex rel. Stevens*[94] in referring to liability under the Act being "essentially punitive in nature."[95] But such a statement ignores that the Supreme Court explicitly reviewed the *Stevens* holding three years after deciding it and championed the remedial nature of the Act.[96]

104.    In the end, courts have generally embraced the theory of "implied certification" as a needed tool to reach beyond express falsehoods to examine whether a sufficient nexus exists between payment and adherence to the particular contract term that has been violated by a defendant. Some courts, unfortunately, take a conservative approach for example, by finding that an invoice "impliedly certifies" compliance with only those contract terms expressly identified in the contract as preconditions to payment.[97] However, those courts

---

[93] *Id.* at 25.

[94] 529 U.S. 765 (2000).

[95] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (citing *Vermont Agency of Nat. Res. V. United States ex re. Stevens*, 529 U.S. 765, 784 (2000).

[96] *Cook County v. United States ex re. Chandler*, 538 U.S. 119 (2003)

[97] *United States ex rel. Graves v. ITT Educ. Servs.*, 284 F. Supp. 2d 487, 502 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004) (citing *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001), *abrogated by Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016) (defendant operator of technical colleges participated in government financial assistance program and violated associated regulation that prohibited incentive payments to its recruiters based on successful enrollment; court found that claims for federal funds were not "false claims" because "the regulation that Relators allege was violated is a condition of eligibility to

that required express identification of such terms have now been overruled by the Supreme Court's *Escobar* decision. In this case, we have specific examples of individual false submissions.

105.    Applying the post-*Escobar* implied certification analysis, a court noted that the Supreme Court refused to "'resolve whether all claims for payment implicitly represent that the billing party is entitled to payment.'"[98] However, prior to *Escobar*, the D.C. Circuit did address this issue in *United States v. Science Applications International Corp.*[99] and found an implied false certification need not include express contractual language specifically linking compliance to eligibility for payment.[100] Instead, all that must be shown is that the contractor withheld information about its noncompliance with material contractual requirements.[101] Since the Supreme Court did not address that issue, the standard announced in *Science Applications* survived the *Escobar* decision.[102] As such, in the post-*Escobar Landis* case,[103] the court denied the defendants' summary judgment

---

participate in the program, not an express condition of payment of specific claims or retention of payments.");
*United States ex rel. Coppock v. Northrop Grumman Corp.*, 2003 U.S. Dist. LEXIS 12626, at *40 (N.D. Tex. July 22, 2003) (citing *United States v. Southland Mgmt. Corp.*, 326 F.3d 669, 675-77 (5th Cir. 2003) (en banc) (defendant rented property from the government and specifically promised in its lease contracts to comply with environmental laws; despite defendant violating those laws, court refused to find that the defendant impliedly certified compliance with those laws because lease contract did not expressly state that continued use of property depended on compliance with environmental laws or that "failure to certify statutory or contractual compliance would *necessarily* have resulted in termination of the leases."); *United States ex rel. King v. F.E. Moran, Inc.*, 2002 U.S. Dist. LEXIS 16277 (N.D. Ill. Aug. 29, 2002)). Although these cases at least recognize the theory of "implied certification," the courts all but ignore that there is an obvious and necessary nexus between payment under federal contracts and compliance with the requirements of those very contracts.

[98] *United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 573470, at *11 (D.D.C. Feb. 13, 2017) (quoting *Escobar*, 136 S. Ct. 1989, 200 (2016)).

[99] 626 F.3d 1257 (D.C. Cir. 2010).

[100] *Landis*, 2017 WL 573470, at *11 (quoting *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257 (D.C. Cir. 2010)).

[101] *Id.*

[102] *Id.* (citing *United States v. Dynamic Visions, Inc.*, 2016 WL 6208349, at *9 (D.D.C. Oct. 24, 2016)).

[103] *United States ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 573470 (D.D.C. Feb. 13, 2017).

motion since the government provided evidence that Lance Armstrong withheld information about his team's doping and that the anti-doping provisions of the sponsorship agreements were material to the decision to continue the sponsorship and to make payments.[104]

## DAMAGE CALCULATION

106. The number of non-prescription items that were submitted for payment may be obtained from the Defendants. This number is needed to calculate damages owed to the government. The amount should be the cost to the government of the false prescriptions, as well as all prescription fees, etc. All of which should be put forward in the initial Rule 26f disclosures, or could be obtained by subpoena prior to serving this action.

107. The total amount the government paid on the Defendants' schemes would be multiplied by three unless the Defendants cooperate as required by the government; then it would be two times the amount. At this point, any credits that are owed to the Defendants would be granted. After this, we would count the number of occurrences (claims submitted) and multiply them by the table on pages 22 and 23, which are pursuant to the statutes set by Congress. Attorney fees and costs would then be calculated, along with reasonable related expenses, such as expert and consultant fees, and then pre- and post- interest should be applied.

---

[104] *Id.* at *12.

## NATURE AND EXTENT OF THE DEFENDANTS' WRONGFUL CONDUCT

108.   These Defendants are a very organized and directly supervised company, that is uniform in their practice and procedure. They conduct seminars and training sessions to ensure that the employees perform in a uniform manner. Therefore, upon information and belief, the Relator believes that the practice set forth herein is uniform throughout NuMotion and those doing business under their name. The Relators have intimate knowledge of the facts set forth as to the operations, billing, and practices within Numotion, and it is believed that these practices are systemic throughout both Defendants' operations. They operate on a national computer system basis. Any customer throughout the United States can be identified at any other location in the U.S., along with their purchase records and payment history.

## VI. CLAIMS

### COUNT 1: False Claims Submitted Under 31 U.S.C. § 3729(a)(1)(A)

109.   The FCA provides liability for any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. §3729(a)(1)(A).

110.   As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly presented or caused to be presented false or fraudulent claims to Federal healthcare programs for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

Page | 38

111.　As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein the Defendants have knowingly presented or caused to be approved at a time when the Defendants knew or should have known that they were not eligible to receive or submit requests for federal funds.

112.　The United States Government, or its authorized agent, unaware of the improper supervision orchestrated by the Defendants, paid the false and/or fraudulent claims. A violation of §3729(a)(l)(A) which was material to the Government's decision to make payment.

113.　Defendants knowingly submitted claims that were not valid, knowing that said goods and services would be billed to the federal government through a legitimate government beneficiary, all to the harm of the government.

114.　Further, the Defendants knew at the time of submission of the claim for payment that the claimants did not qualify to receive payments, but Defendants submitted the claims as if they were valid claims, and they were eligible to be paid by the government.

115.　By virtue of the false or fraudulent claims the Defendants knowingly caused to be presented, the United States Government has suffered substantial monetary damages. Defendants authorized the submission of the claims by Defendants, as well as the performance of providing sales and service to beneficiaries, substandard products and services to mobile medical equipment by uncoordinated employees to the harm of the federal government and the program beneficiaries, with the intent that the false claims be paid by the federal government.

116.    That these false claims were billed as legitimate claims filled in compliance of the applicable state laws, as well as federal laws, for services legally performed under the contract for services. They were not performed pursuant to the contract with the government.

117.    The prescriptions complained of herein were not medically necessary and falsely submitted to the government for payment.

118.    The Defendants claims submitted to the government were false as follows:

(1) They failed to provide services as billed by their universal elimination of contact between the beneficiaries and their doctor/physician. This was a significant reduction in the health service provided under the contract and renders the representation by the defendants false as performed willingly and knowingly by the Defendants when submitted to the government for payment.

(2) All claims submitted were false as they were submitted for payment to the government at a time when the Defendants were acting together in a kickback scheme of no audits.

(3) That the Defendants were not eligible to submit claims to the government for payment.

(4) That the Defendants submitted claims for supplies and equipment knowing that such supplies and equipment were not medically necessary.

(5) The Defendants were operating a kickback scheme.

Page | 40

## COUNT 2: USE OF FALSE RECORDS UNDER 31 U.S.C. § 3729 (a)(1)(B)

119. The Defendants used false and/or fraudulent documents to get the false claims accepted and paid by the federal government.

120. The Defendants used various false and fraudulent documents, such as emails authorizing policies and procedures, and records from which the slips were saved and used as a document to support the transactions and claims for support.

121. The Defendants used altered notices and authorizations that were fabricated by the Defendants employees to get claims paid.

122. Defendants used, and caused to be used, incomplete and false beneficiary qualifications for medical equipment forms and maintained and submitted the same to the government for payment of said claims.

## COUNT 3: CONSPIRACY UNDER 31 U.S.C. § 3729 (a)(1)(C)

123. The Defendants and their subsidiaries agreed and conspired to obtain money from the federal government for which neither were entitled to, or for which neither had provided medically necessary medical supplies, products, and/or custom equipment.

124. That Defendants committed overt acts by and through their agents, employees, and representatives which include but were not limited to:

(a) Submitting false claims to the government;

(b) Ordering employees to file unlawful documents as if they were legal prescriptions for medically necessary purposes;

(c) Keeping records of prescriptions issued;

(d) Receiving and maintaining funds fraudulently obtained from the FEP, as well as concealing and distributing said funds;

(e) Used, sent, and received communications regarding the conspiracy and the orders to act in the furtherance of the conspiracy by telephone, email, and by virtue of the internet;

(f) Mailed, by US Mail and other means, false documents and prescriptions, including prescriptions that were not medically necessary.

## COUNT 4: RETENTION OF OVERPAYMENT OF FUNDS UNDER 31 U.S.C. § 3729(a)(1)(G)

125.    Upon information and belief, no Defendants reported the money that was collected as a result of the submission of false claims to the federal government for payment, nor did either repay the amounts they wrongfully received, contrary to 31 USC 3729(a)(1)(G) and 42 USC 1320 a-7b(b).

126.    The United States Government, or its authorized agent, unaware of the improper supervision orchestrated by Defendants, paid the false and/or fraudulent claims. A violation of§ 3729(a)(l)(A) is material to the Government's decision to make payment.

127.    Defendants knowingly filled and refilled prescriptions that were not valid, knowing that said prescriptions would be billed to the federal government through a legitimate government beneficiary, all to the harm of the government.

128.   Further, Defendants knew at the time of submission of the claim for payment that the claimant did not qualify to receive payments, but Defendants submitted the claims as if they were valid claims and they were eligible to be paid by the government.

129.   Further, Defendants retained the money received even after their fraud was acknowledged by upper management and the activity has continued. Beyond the time allowed for self-reporting and at all times, Defendants, their agents, supervisors, and management knew the claims were not for valid, lawful prescriptions and should not have been submitted as if they were. The Defendants took the money for the invalid prescriptions and kept it, all the while knowing that to do so was beyond lawful limits and unlawful retention of funds that they were unqualified to receive.

130.   By virtue of the false or fraudulent claims Defendants knowingly caused to be presented, the United States Government has suffered substantial monetary damages.

## COUNT 5:  RETALIATION UNDER 31 U.S.C. § 3730(h)

131.   The allegations set forth above are hereby incorporated as if fully set forth herein.

132.   The Defendants began a program of harassment and retaliation against the Relators, ultimately leading to the discharge of one Relator (Garrett) and harm to another (Normand).

133.   Under the FCA Relator is entitled to relief for such damages, including reinstatement, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained from the discrimination, including litigation costs and reasonable attorneys' fees.

## VIII. TRIAL BY JURY

134. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Relator hereby demands trial by jury.

**WHEREFORE**, Relators, on behalf of themselves and the United States, pray that the Court enter judgment against Defendants in an amount equal to the amount determined pursuant to the Federal False Claims Act and the Anti-Kickback Statute as damages the United States sustained, plus civil penalties for each and every violation as prescribed by statute; that the Relators be awarded an amount that the Court decides pursuant to the Federal False Claims Act and the Anti-Kickback Statute as reasonable for collecting such civil penalties and damages; and that the Relators be awarded all costs and expenses incurred, including reasonable attorney's fees; that the Relators be awarded judgment against the Defendants for retaliation and full compensation for the retaliation against the Relators along with reasonable attorney's fees and costs; and other such relief the Court deems appropriate.

Respectfully submitted,

GAYLON C. HAYES, Lead Counsel
Oklahoma Bar 14492; Tx Bar 24071384
HARRY "SKEETER" JORDAN
Oklahoma Bar 32437
6805 South Western Ave. Suite 500
Oklahoma City, OK 73139
Telephone: 405/616-5045
Facsimile: 405/616-5062
gaylon@hhhlawfirm.com

Page | 44

whitney@hhhlawfirm.com
skeeter@blsmithlaw.com
*Attorneys for Relators*